B066

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**FILED**

MAY 09 2023

CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

DREW PIERCE
MARK MARRIOTT
JOHN LAENG
  a/k/a JACK LAENG
JOHN O'BRIEN
CHRISTOPHER O'BRIEN

Criminal No. 23-90

**[UNDER SEAL]**

(18 U.S.C. §§ 1349, 1343, 1956(h), and 1341)

## INDICTMENT

### Individuals and Entities

The grand jury charges that at times relevant to this Indictment:

1.    Primary Health Network ("PHN") was a non-profit organization headquartered in Sharon, Pennsylvania, in the Western District of Pennsylvania. As the largest Federally Qualified Health Center in Pennsylvania, PHN employed physicians, dentists, physician assistants, certified nurse practitioners, and other health professionals to provide comprehensive primary care and specialty medical services to patients regardless of their ability to pay. From as early as 2011, and continuing until approximately 2019, PHN was defrauded of more than $2,000,000 through a series of schemes perpetrated by, among others, high-ranking PHN officers and employees who sought the funds for their own personal benefit.

2.    FQHC-MSF was a Pennsylvania non-profit corporation, headquartered in Sharon, Pennsylvania, in the Western District of Pennsylvania.

3.    Lewistown-MSF, LLC ("Lewistown-MSF"), was a Pennsylvania limited liability company with two members: FQHC-MSF, which held a 70% ownership interest, and Palu Investment Group, Ltd. ("Palu"), a PHN subsidiary, which held a 30% interest.

4.      DREW PIERCE ("PIERCE") was a resident of West Middlesex, Pennsylvania. From at least 2011, to in and around 2014, PIERCE was the Chief Financial Officer ("CFO") for PHN. From in and around 2014, through in and around July 2020, he was the Chief Executive Officer ("CEO") of PHN. In that role, he oversaw all of PHN's operations. PIERCE was also President of Palu.

5.      MARK MARRIOTT ("MARRIOTT") was a resident of Hermitage, Pennsylvania and, later, Sharpsville, Pennsylvania, and was PHN's facilities administrator. In that role, he supervised all facilities projects, including the maintenance of existing facilities and the building of new facilities for PHN. Among other tasks, in his role as PHN's facilities administrator, he was required to hire general contractors and/or subcontractors to perform work on PHN's facilities projects.

6.      JOHN LAENG, a/k/a JACK LAENG, ("LAENG"), was a resident of West Middlesex, Pennsylvania. From at least 2011, through in and around 2014, he was the CEO of PHN. Thereafter, LAENG continued to be paid as an employee of PHN through the end of 2016. From FQHC-MSF's inception in and around 2016 until at least 2020, LAENG was FQHC-MSF's President.

7.      JOHN O'BRIEN was a resident of Masury, Ohio. He controlled Keystone Tele-Data, a telecommunications company.

8.      CHRISTOPHER O'BRIEN was a resident of Masury, Ohio. He owned and controlled Excel Construction Services, LLC, ("Excel") a general contracting company.

9.      Co-Conspirator 1 was an attorney who provided legal services for PHN and FQHC-MSF.

2

10.     TopCoat Plus LLC ("TopCoat") was a purported "management company" owned 50% by MARRIOTT and 50% by ThreeSDJ LLC. Nominally headquartered in Sharon, Pennsylvania, TopCoat had no employees.

11.     ThreeSDJ LLC ("ThreeSDJ") was a purported "ice cream parlor" business headquartered at PIERCE's home in West Middlesex, Pennsylvania. It was owned 1/3 by PIERCE, 1/3 by LAENG, and 1/3 by Co-Conspirator 1.

12.     Development Consultant 1 ("DC1") was an entity that provided development consulting services to entities looking to build medical facilities. It was owned 50% by an entity controlled by Co-Conspirator 2 and 50% by Individual 1.

13.     JDS Health Care Strategies LLC ("JDS") was a purported "management consulting" company, owned 1/3 by PIERCE, 1/3 by LAENG, and 1/3 by Co-Conspirator 1.

14.     PenKey Holdings LLC ("PenKey") was a purported rental real estate business, headquartered at PIERCE's home in West Middlesex, Pennsylvania. It was owned 50% by MARRIOTT and 50% by PIERCE.

15.     Flooring Business 1 was operated by Individual 2.

### *The TopCoat Scheme*

### COUNT ONE

16.     The grand jury re-alleges and incorporates by reference the factual allegations contained in paragraphs 1-7 and 9-11 of this Indictment as if fully set forth herein.

17.     From no later than in and around January 2016, through in and around January 2019, in the Western District of Pennsylvania and elsewhere, Defendants, DREW PIERCE, MARK MARRIOTT, JACK LAENG, and JOHN O'BRIEN, together and with others known and unknown to the grand jury, knowingly and voluntarily conspired, combined, confederated, and agreed to commit the crime of wire fraud, in violation of Title 18, United States Code, Section 1343.

### OBJECT OF THE CONSPIRACY

18.     It was the object of the conspiracy that PIERCE, MARRIOTT, LAENG, and JOHN O'BRIEN would submit and cause to be submitted fraudulent invoices to PHN and Lewistown-MSF, seeking payment for services purportedly performed by TopCoat, though TopCoat had done no work. PIERCE, MARRIOTT, LAENG, and JOHN O'BRIEN caused PHN and Lewistown-MSF to pay TopCoat amounts consistent with the fraudulent invoices, thereby enriching themselves.

### MANNER AND MEANS OF THE CONSPIRACY

19.     It was a manner and means of the conspiracy that MARRIOTT, in his position as PHN's facilities administrator, entered into agreements with vendors for goods and services to be provided to PHN.

20.     It was a further manner and means of the conspiracy that MARRIOTT caused to be created fraudulent invoices from TopCoat to PHN, purporting to have provided goods

4

and services to PHN. In reality, TopCoat did no work, and the same or similar goods and services were provided by other vendors, at a lower price than that charged by TopCoat.

21. It was a further manner and means of the conspiracy that MARRIOTT, in his position as PHN's facilities administrator, approved the fraudulent invoices from TopCoat.

22. It was a further manner and means of the conspiracy that MARRIOTT caused PHN to pay TopCoat the amounts listed on the TopCoat invoices.

23. It was a further manner and means of the conspiracy that PIERCE used checks from TopCoat to pay vendors who actually provided goods and services to PHN, for which TopCoat billed PHN.

24. It was a further manner and means of the conspiracy that PIERCE paid a portion of TopCoat's profits from the scheme (the difference between the payments PHN paid to TopCoat and the payments TopCoat paid to vendors) to MARRIOTT and a portion to ThreeSDJ.

25. It was a further manner and means of the conspiracy that LAENG, as President of FQHC-MSF, and PIERCE, as President of Palu, caused the creation of Lewistown-MSF.

26. It was a further manner and means of the conspiracy that Lewistown-MSF was the project manager in charge of developing, constructing, and operating a federally qualified health center in Lewistown, Pennsylvania ("the Lewistown facility").

27. It was a further manner and means of the conspiracy that Lewistown-MSF entered into a contract with MARRIOTT for MARRIOTT to serve as the construction manager for the building of the Lewistown facility.

28. It was a further manner and means of the conspiracy that MARRIOTT, in his role as construction manager for Lewistown-MSF and as facilities administrator for PHN, was responsible for hiring vendors for services in the construction of the Lewistown facility.

5

29.     It was a further manner and means of the conspiracy that, in and around December of 2016, JOHN O'BRIEN caused Keystone Tele-Data to provide MARRIOTT with an inflated bid of $361,000 for "systems" services at the Lewistown facility.

30.     It was a further manner and means of the conspiracy that, in and around December of 2016, the "systems" budget for the Lewistown facility was set at $574,991.

31.     It was a further manner and means of the conspiracy that, in and around December of 2016, PIERCE directed that Keystone Tele-Data enter into a contract for "systems" services with TopCoat, rather than with Lewistown-MSF, so that TopCoat could bill Lewistown-MSF the full budgeted amount and then pay Keystone Tele-Data the lower, contracted amount.

32.     It was a further manner and means of the conspiracy that, in and around May of 2017, JOHN O'BRIEN caused Keystone Tele-Data to provide MARRIOTT with an inflated bid of $510,000 for the same "systems" services at the Lewistown facility, previously bid at $361,000.

33.     It was a further manner and means of the conspiracy that MARRIOTT approved and LAENG accepted the $510,000 proposal from Keystone Tele-Data.

34.     It was a further manner and means of the conspiracy that MARRIOTT, PIERCE, and LAENG caused Lewistown-MSF to enter into a sham contract with TopCoat for $674,991 for "systems" services, though MARRIOTT, PIERCE, and LAENG knew that TopCoat would do no work pursuant to the contract. MARRIOTT, PIERCE, and LAENG caused Lewistown-MSF to pay inflated rates for the services Keystone Tele-Data provided. For example, TopCoat charged $77,318.75 for CCTV services that Keystone Tele-Data provided at a cost of $57,318.75, $118,268.75 for data/wiring services that Keystone Tele-Data provided at a cost of $98,268.75, and $66,819.75 for mag locks that Keystone Tele-Data provided for $46,819.75.

6

35.     It was a further manner and means of the conspiracy that MARRIOTT, PIERCE, and LAENG caused Lewistown-MSF to pay TopCoat approximately $719,396.02 for the "systems" project in 2018 and 2019.

36.     It was a further manner and means of the conspiracy that TopCoat paid Keystone Tele-Data $510,000 for the "systems" project.

37.     It was a further manner and means of the conspiracy that PIERCE paid a portion of TopCoat's profits from the fraud with respect to the "systems" project (the difference between the payments Lewistown-MSF paid to TopCoat and the payments TopCoat paid to Keystone Tele-Data) to MARRIOTT and a portion to ThreeSDJ.

38.     It was a further manner and means of the conspiracy that PIERCE and LAENG caused ThreeSDJ to pay out the funds received from TopCoat to themselves and to Co-Conspirator 1.

39.     It was a further manner and means of the conspiracy that, in exchange for receiving the inflated price of $510,000 for "systems" services, JOHN O'BRIEN directed the payment of a series of kickbacks from Keystone Tele-Data to MARRIOTT. Included among those kickbacks were payments by Keystone Tele-Data for MARRIOTT's personal lumber invoices, and a check in the amount of $15,000, dated August 13, 2018, from Keystone Tele-Data to MARRIOTT.

In violation of Title 18, United States Code, Section 1349.

7

## COUNTS TWO THROUGH FOUR

40.    The grand jury re-alleges and incorporates by reference the factual allegations contained in paragraphs 1-7, 9-11, and 18-39 of this Indictment as if fully set forth herein.

41.    From no later than in and around January 2016, through in and around January 2019, in the Western District of Pennsylvania and elsewhere, Defendants PIERCE, MARRIOTT, LAENG, and JOHN O'BRIEN devised and intended to devise a scheme and artifice to defraud and for obtaining money from PHN and Lewistown-MSF by means of false and fraudulent pretenses, representations, and promises, well knowing at the time that the pretenses, representations, and promises were false and fraudulent when made.

42.    It was a part of the scheme and artifice to defraud that Defendants produced and caused to be paid fraudulent invoices from TopCoat, purporting to have provided services for PHN and Lewistown-MSF. In reality, TopCoat did no work, and the true vendor charged a lower price for any provided good or service.

43.    On or about the dates listed in the table below, in the Western District of Pennsylvania and elsewhere, Defendants PIERCE, MARRIOTT, LAENG, and JOHN O'BRIEN, for the purpose of executing and attempting to execute the scheme and artifice to defraud described above, did transmit and cause to be transmitted in interstate commerce, by means of a wire communication, certain signs, signals, and sounds, that is, the below-listed emails, with each transmission constituting a separate count:

| Count | Approximate Date | Description of Wire |
|---|---|---|
| 2 | 6/16/2018 | Email from MARRIOTT to LAENG with subject line "Re: Midland and topcoat invoice", discussing TopCoat invoices. |
| 3 | 12/17/18 | Email from PIERCE to MARRIOTT with subject line "RE: Topcoat invoice and legal invoice", discussing payments from TopCoat for Lewistown "systems." |

8

| 4 | 5/17/19 | Email from LAENG to Co-Conspirator 2 and MARRIOTT with subject line "Fwd: Lewistown Draw #20", requesting MARRIOTT to create a TopCoat invoice dated November 2018. |
|---|---------|---|

In violation of Title 18, United States Code, Section 1343.

## COUNT FIVE

44.    The grand jury re-alleges and incorporates by reference the factual allegations contained in paragraphs 1-6, 9-11, and 18-39 of this Indictment as if fully set forth herein.

45.    From on or about March 17, 2017, through on or about October 22, 2018, in the Western District of Pennsylvania and elsewhere, Defendants, PIERCE, MARRIOTT, and LAENG, did knowingly combine, conspire, and agree with each other and with other persons known and unknown to the grand jury to commit offenses against the United States in violation of Title 18, United States Code, Section 1957, to wit: to knowingly engage and attempt to engage in monetary transactions by, through, or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity.

46.    It is further alleged that the specified unlawful activity was wire fraud, in violation of Title 18, United States Code, Section 1343.

### MANNER AND MEANS OF THE CONSPIRACY

47.    It was a manner and means of the conspiracy that PIERCE, MARRIOTT, and LAENG defrauded PHN and Lewistown-MSF of money by causing those entities to pay fraudulent invoices from TopCoat. PIERCE, MARRIOTT, and LAENG caused the proceeds of their TopCoat scheme to be deposited into a bank account held in TopCoat's name.

48.    It was a further manner and means of the conspiracy that on or about March 17, 2017, PIERCE, MARRIOTT, and LAENG caused the issuance of two $60,000 checks from the TopCoat bank account, using funds in each case that constituted more than $10,000 derived

from the crime of wire fraud. One $60,000 check was made payable to MARRIOTT and one to ThreeSDJ.

49.     It was a further manner and means of the conspiracy that on or about March 19, 2017, PIERCE, MARRIOTT, and LAENG caused the issuance of two $20,000 checks from the ThreeSDJ bank account, using funds in each case that constituted more than $10,000 derived from the crime of wire fraud. One $20,000 check was made payable to PIERCE and one to LAENG.

50.     It was a further manner and means of the conspiracy that on or about October 22, 2018, PIERCE, MARRIOTT, and LAENG caused the issuance of two $60,000 checks from the TopCoat bank account, using funds in each case that constituted more than $10,000 derived from the crime of wire fraud. One $60,000 check was made payable to MARRIOTT and one to ThreeSDJ.

51.     It was a further manner and means of the conspiracy that on or about October 24, 2018, PIERCE, MARRIOTT, and LAENG caused the issuance of two $20,000 checks from the ThreeSDJ bank account, using funds in each case that constituted more than $10,000 derived from the crime of wire fraud. One $20,000 check was made payable to PIERCE and one to LAENG.

In violation of Title 18, United States Code, Section 1956(h).

### *The JDS Scheme*

## COUNT SIX

52.     The grand jury re-alleges and incorporates by reference the factual allegations contained in paragraphs 1-4, 6, and 12-13 of this Indictment as if fully set forth herein.

53.     From on or about October 17, 2011, through in and around September 2019, in the Western District of Pennsylvania and elsewhere, Defendants, PIERCE and LAENG, together and with others known and unknown to the grand jury, knowingly and voluntarily conspired, combined, confederated, and agreed to commit the crime of wire fraud, in violation of Title 18, United States Code, Section 1343.

## OBJECT OF THE CONSPIRACY

54.     It was the object of the conspiracy that PIERCE and LAENG would enrich themselves by causing PHN and Lewistown-MSF to pay inflated monetary amounts to DC1, directly and indirectly, so that DC1 would use the funds received to make payments to JDS.

## MANNER AND MEANS OF THE CONSPIRACY

55.     It was a manner and means of the conspiracy that DC1 contracted with JDS Healthcare Strategies ("JDS") to pay JDS 50% of the total gross fee DC1 received from entities, like PHN, that hired DC1 for development consulting services, though JDS performed no work for DC1 beyond work JDS's principals were already required to do based on their positions with PHN and FQHC-MSF.

56.     It was a further manner and means of the conspiracy that LAENG and PIERCE caused PHN to enter into inflated contracts with DC1 for consulting services related to the construction of facilities.

12

57.   It was a further manner and means of the conspiracy that LAENG and PIERCE caused PHN to pay more than $1 million to DC1.

58.   It was a further manner and means of the conspiracy that LAENG and PIERCE fraudulently concealed from PHN that the payments to DC1 were, in part, payments to JDS that were simply being routed through DC1.

59.   It was a further manner and means of the conspiracy that DC1 paid JDS approximately 50% of the money it received from PHN.

60.   It was a further manner and means of the conspiracy that LAENG and PIERCE caused JDS to pay a portion of the proceeds of the scheme to themselves and to Co-Conspirator 1.

61.   It was a further manner and means of the conspiracy that, on or about December 22, 2016, LAENG caused Lewistown-MSF to enter into a development agreement with DC1, pursuant to which DC1 would receive 4% of the development costs from the Lewistown facility.

62.   It was a further manner and means of the conspiracy that, on or about December 22, 2016, LAENG caused Lewistown-MSF to enter into a project management agreement with FQHC-MSF, pursuant to which FQHC-MSF would receive a project management fee.

63.   It was a further manner and means of the conspiracy that, as LAENG directed Co-Conspirator 2 by email dated July 12, 2017, "After receiving each draw payment [from Lewistown-MSF], [FQHC-MSF] will forward the entire [DC1] and [FQHC-MSF] allocations to you so you can turn around and send back 50% of that total to JDS."

13

64.    It was a further manner and means of the conspiracy that LAENG and PIERCE caused money to go from Lewistown-MSF to DC1, directly and indirectly, using FQHC-MSF and an account controlled by Co-Conspirator 1 as intermediaries.

65.    It was a further manner and means of the conspiracy that LAENG and PIERCE caused DC1 to receive hundreds of thousands of dollars from Lewistown-MSF, directly and indirectly.

66.    It was a further manner and means of the conspiracy that LAENG and PIERCE fraudulently concealed from Lewistown-MSF that the payments to DC1 and to FQHC-MHF were, in part, payments to JDS that were simply being routed through DC1 and FQHC-MSF.

67.    It was a further manner and means of the conspiracy that LAENG and PIERCE caused DC1 to pay JDS approximately 50% of the funds received, directly and indirectly, from Lewistown-MSF.

68.    It was a further manner and means of the conspiracy that LAENG and PIERCE caused JDS to pay a portion of the proceeds of the scheme to themselves and to Co-Conspirator 1.

In violation of Title 18, United States Code, Section 1349.

## COUNTS SEVEN THROUGH NINE

69.    The grand jury re-alleges and incorporates by reference the factual allegations contained in paragraphs 1-4, 6, 12-13 and 54-68 of this Indictment as if fully set forth herein.

70.    From on or about October 17, 2011, through in and around September 2019, in the Western District of Pennsylvania and elsewhere, Defendants PIERCE and LAENG devised and intended to devise a scheme and artifice to defraud and for obtaining money from PHN and Lewistown-MSF by means of false and fraudulent pretenses, representations, and promises, well knowing at the time that the pretenses, representations, and promises were false and fraudulent when made.

71.    It was a part of the scheme and artifice to defraud that Defendants PIERCE and LAENG caused PHN and Lewistown-MSF to pay inflated amounts to DC1, directly and indirectly. Defendants PIERCE and LAENG fraudulently concealed that the excess funds were used by DC1 to pay kickbacks to JDS.

72.    On or about the dates listed in the table below, in the Western District of Pennsylvania and elsewhere, Defendants PIERCE and LAENG, for the purpose of executing and attempting to execute the scheme and artifice to defraud described above, did transmit and cause to be transmitted in interstate commerce, by means of a wire communication, certain signs, signals, and sounds, that is, the below-listed emails, with each transmission constituting a separate count:

| Count | Approximate Date | Description of Wire |
|-------|------------------|---------------------|
| 7 | 7/19/2018 | Email from PIERCE to Co-Conspirator 2, CC LAENG with subject line "DC1-JDS Development Fee Analysis – Lewistown.xlsx", discussing amounts DC1 owed JDS. |
| 8 | 10/18/2018 | Email from LAENG to PIERCE with subject line "LEWISTOWN STATUS of REMAINING FUNDS – check my |

15

| | | |
|---|---|---|
| | | calculations", discussing the flow of funds from the Lewistown project, including amounts owed to DC1 and JDS. |
| 9 | 8/29/19 | Email from LAENG to Co-Conspirator 2 with subject line "Re: Health centers", discussing payment to DC1 and requesting payment back to JDS. |

In violation of Title 18, United States Code, Section 1343.

16

## COUNT TEN

73.   The grand jury re-alleges and incorporates by reference the factual allegations contained in paragraphs 1-4, 6, 12-13 and 54-68 of this Indictment as if fully set forth herein.

74.   From on or about January 23, 2013, through on or about June 4, 2019, in the Western District of Pennsylvania and elsewhere, Defendants, PIERCE and LAENG, did knowingly combine, conspire, and agree with each other and with other persons known and unknown to the grand jury to commit offenses against the United States in violation of Title 18, United States Code, Section 1957, to wit: to knowingly engage and attempt to engage in monetary transactions by, through, or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity.

75.   It is further alleged that the specified unlawful activity was wire fraud, in violation of Title 18, United States Code, Section 1343.

## MANNER AND MEANS OF THE CONSPIRACY

76.   It was a manner and means of the conspiracy that PIERCE and LAENG defrauded PHN and Lewistown-MSF of money through the use of DC1 as an intermediary for funds destined for JDS. PIERCE and LAENG caused the proceeds of their JDS scheme to be deposited into a bank account in the name of JDS.

77.   It was a further manner and means of the conspiracy that on or about January 30, 2018, PIERCE and LAENG caused the issuance of two $35,000 checks from the JDS bank account, using funds in each case that constituted more than $10,000 derived from the crime of wire fraud. One $35,000 check was made payable to PIERCE and one to LAENG.

17

78. It was a further manner and means of the conspiracy that on or about April 12, 2018, PIERCE and LAENG caused the issuance of two $20,000 checks from the JDS bank account, using funds in each case that constituted more than $10,000 derived from the crime of wire fraud. One $20,000 check was made payable to PIERCE and one to LAENG.

79. It was a further manner and means of the conspiracy that on or about July 6, 2018, PIERCE and LAENG caused the issuance of two $25,000 checks from the JDS bank account, using funds in each case that constituted more than $10,000 derived from the crime of wire fraud. One $25,000 check was made payable to PIERCE and one to LAENG.

80. It was a further manner and means of the conspiracy that on or about January 21, 2019, PIERCE and LAENG caused the issuance of two $40,000 checks from the JDS bank account, using funds in each case that constituted more than $10,000 derived from the crime of wire fraud. One $40,000 check was made payable to PIERCE and one to LAENG.

81. It was a further manner and means of the conspiracy that on or about June 4, 2019, PIERCE and LAENG caused the issuance of two $15,000 checks from the JDS bank account, using funds in each case that constituted more than $10,000 derived from the crime of wire fraud. One $15,000 check was made payable to PIERCE and one to LAENG.

In violation of Title 18, United States Code, Section 1956(h).

*The Excel Scheme*

**COUNT ELEVEN**

82. The grand jury re-alleges and incorporates by reference the factual allegations contained in paragraphs 1, 4, 5, 8, 14, and 15 of this Indictment as if fully set forth herein.

83. From in and around March 2018, through in and around November 2020, in the Western District of Pennsylvania and elsewhere, Defendants, DREW PIERCE, MARK MARRIOTT, and CHRISTOPHER O'BRIEN, together and with others known and unknown to the Grand Jury, knowingly and voluntarily conspired, combined, confederated, and agreed to commit the crime of wire fraud, in violation of Title 18, United States Code, Section 1343.

**OBJECT OF THE CONSPIRACY**

84. It was the object of the conspiracy that PIERCE, MARRIOTT, and CHRISTOPHER O'BRIEN would enrich themselves by causing PHN to pay Excel inflated amounts for purported contracting services, and by taking the proceeds for themselves, both directly and through PenKey.

**MANNER AND MEANS OF THE CONSPIRACY**

85. It was a manner and means of the conspiracy that MARRIOTT caused PHN to hire Excel to provide general contracting services.

86. It was a further manner and means of the conspiracy that PIERCE, MARRIOTT, and CHRISTOPHER O'BRIEN caused Excel to submit fraudulent invoices to PHN, including by fraudulently billing for services that were never performed. For example, in 2019, PIERCE directed Individual 2 to contact CHRISTOPHER O'BRIEN to receive directions on how to obtain funds. CHRISTOPHER O'BRIEN directed Individual 2 to create fraudulent

19

invoices to Excel on behalf of Flooring Business 1, billing for services that were never actually performed. Individual 2 created the fraudulent invoices, and submitted those invoices to Excel. Excel then billed PHN for services corresponding to the fraudulent invoices created by Individual 2.

87.     It was a further manner and means of the conspiracy that PIERCE and MARRIOTT caused PHN to pay Excel amounts corresponding to the fraudulent invoices.

88.     It was a further manner and means of the conspiracy that PIERCE, MARRIOTT, and CHRISTOPHER O'BRIEN directed Individual 2 that the funds he received from Excel were a loan that needed to be paid back to PenKey.

89.     It was a further manner and means of the conspiracy that Individual 2 issued checks to PenKey, an entity owned 50% by MARRIOTT and 50% by PIERCE.

In violation of Title 18, United States Code, Section 1349.

## COUNTS TWELVE THROUGH FOURTEEN

90.     The grand jury re-alleges and incorporates by reference the factual allegations contained in paragraphs 1, 4, 5, 8, 14, 15, and 84-89 of this Indictment as if fully set forth herein.

91.     From in and around March 2018, through in and around November 2020, in the Western District of Pennsylvania and elsewhere, Defendants PIERCE, MARRIOTT, and CHRISTOPHER O'BRIEN devised and intended to devise a scheme and artifice to defraud and for obtaining money and property from PHN by means of false and fraudulent pretenses, representations, and promises, well knowing at the time that the pretenses, representations, and promises were false and fraudulent when made.

92.     It was a part of the scheme and artifice to defraud that Defendants PIERCE, MARRIOTT, and CHRISTOPHER O'BRIEN caused to be produced invoices from Flooring Business 1 to Excel, purporting to have provided services that were never performed. Defendants then produced and caused to be produced fraudulent invoices from Excel, which then billed PHN for services corresponding to the fraudulent invoices from Flooring Business 1.

93.     It was a further part of the scheme and artifice to defraud that Defendants caused PHN to pay Excel, including for services corresponding to the fraudulent invoices from Flooring Business 1.

94.     On or about the dates listed in the table below, in the Western District of Pennsylvania and elsewhere, Defendants PIERCE, MARRIOTT, and CHRISTOPHER O'BRIEN, for the purpose of executing and attempting to execute the scheme and artifice to defraud described above, did transmit and cause to be transmitted in interstate commerce, by means of a wire communication, certain signs, signals, and sounds, that is, the below-listed emails, with each transmission constituting a separate count:

21

| Count | Approximate Date | Description of Wire |
|-------|------------------|---------------------|
| 12 | 3/11/2019 | Email from an Excel employee to MARRIOTT, CC CHRISTOPHER O'BRIEN with subject line "PHN – Oil City AIA #3", requesting payment from PHN for, among other things, a flooring invoice. |
| 13 | 3/13/2019 | Email from MARRIOTT to an Excel employee, CC CHRISTOPHER O'BRIEN with subject line "RE: Oil City AIA App #3", directing the Excel employee to send the invoice to a PHN employee. |
| 14 | 3/14/2019 | Email from an Excel employee to a PHN employee, CC MARRIOTT with subject line "PHN – Oil City AIA App #3", attaching an application for payment. |

In violation of Title 18, United States Code, Section 1343.

## *The Personal Benefits Scheme*

## COUNT FIFTEEN

95.    The grand jury re-alleges and incorporates by reference the factual allegations contained in paragraphs 1, 4, and 5 of this Indictment as if fully set forth herein.

96.    From approximately in and around 2015, through in and around January 2019, in the Western District of Pennsylvania and elsewhere, Defendants, PIERCE and MARRIOTT, together and with others known and unknown to the grand jury, knowingly and voluntarily conspired, combined, confederated, and agreed to commit the crime of mail fraud, in violation of Title 18, United States Code, Section 1341.

## OBJECT OF THE CONSPIRACY

97.    It was the object of the conspiracy that PIERCE and MARRIOTT would enrich themselves by using PHN funds to pay personal expenses and by using PHN employees to perform work on PIERCE and MARRIOTT's personal properties during regular business hours when the employees were supposed to be working for PHN.

## MANNER AND MEANS OF THE CONSPIRACY

98.    It was a manner and means of the conspiracy that MARRIOTT and PIERCE caused fraudulent invoices to be issued to PHN for services that had in reality been provided for the personal benefit of MARRIOTT and PIERCE, including the installation of windows at PIERCE's home.

99.    It was a further manner and means of the conspiracy that MARRIOTT and PIERCE caused PHN to pay the fraudulent invoices, though MARRIOTT and PIERCE were not entitled to use PHN funds for personal expenditures without reimbursement.

100.    It was a further manner and means of the conspiracy that MARRIOTT and PIERCE caused PHN to pay additional personal expenses they incurred.

101.    It was a further manner and means of the conspiracy that MARRIOTT and PIERCE caused PHN's books and records to falsely list the payments for their own personal expenditures as business expenses of PHN, fraudulently concealing their theft of company funds.

102.    It was a further manner and means of the conspiracy that MARRIOTT and PIERCE directed PHN employees to perform labor at properties owned by MARRIOTT and PIERCE during working hours. MARRIOTT and PIERCE caused the PHN employees to clock into work for PHN, when in reality they were working for MARRIOTT and PIERCE personally and not for PHN.

In violation of Title 18, United States Code, Section 1349.

## COUNTS SIXTEEN AND SEVENTEEN

103.   The grand jury re-alleges and incorporates by reference the factual allegations contained in paragraphs 1, 4, 5, and 97-102 of this Indictment as if fully set forth herein.

104.   From in and around 2015, through in and around January 2019, in the Western District of Pennsylvania and elsewhere, Defendants PIERCE and MARRIOTT devised and intended to devise a scheme and artifice to defraud and for obtaining money from PHN by means of false and fraudulent pretenses, representations, and promises, well knowing at the time that the pretenses, representations, and promises were false and fraudulent when made.

105.   It was a part of the scheme and artifice to defraud that Defendants PIERCE and MARRIOTT fraudulently utilized PHN funds to pay their own personal expenses, and caused false and fraudulent invoices and bookkeeping records to be created to conceal their fraud.

106.   On or about the dates listed in the table below, in the Western District of Pennsylvania and elsewhere, Defendants PIERCE and MARRIOTT, for the purpose of executing and attempting to execute the scheme and artifice to defraud described above, did knowingly cause to be delivered by the United States mail the items listed below, each such mailing being a separate count:

| Count | Approximate Date | Description of Mailing |
|-------|------------------|------------------------|
| 16 | July 23, 2018 | Check in the amount of $12,374.75 from PHN to a lumber company. |
| 17 | January 2, 2019 | Check in the amount of $2,492.64 from PHN to a lumber company. |

In violation of Title 18, United States Code, Section 1341.

25

## FORFEITURE ALLEGATIONS

1.    The grand jury re-alleges and incorporates by reference the allegations contained in Counts One through Seventeen of this Indictment for the purpose of alleging criminal forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C ) and 982(a)(1), and Title 28, United States Code, Section 2461(c).

2.    The United States hereby gives notice to the defendants charged in Counts Five and Ten that, upon their conviction of any such offenses, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), of all property involved in each offense of conviction in violation of Title 18, United State Code, Section 1956(h), or conspiracy to commit such offenses, and all property traceable to such property, including, but not limited to:

Money Judgment

A sum of money equal to at least approximately $1,421,000.00 in United States currency.

3.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)  cannot be located upon the exercise of due diligence;

(b)  has been transferred or sold to, or deposited with, a third party;

(c)  has been placed beyond the jurisdiction of the court;

(d)  has been substantially diminished in value; or

(e)  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of such defendants up to the value of the forfeitable property

26

described in this forfeiture allegation

4.      The United States hereby gives notice to the defendants charged in Counts One through Four, Six through Nine, and Eleven through Seventeen that, upon their conviction of any such offenses, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property constituting or derived from proceeds obtained directly or indirectly as a result of such offenses, including, but not limited to:

Money Judgment

A sum of money equal to at least approximately $2,293,715.12 in United States currency, representing the approximate amount of proceeds obtained as a result of the offenses.

5.      If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other

27

property of the defendants up to the value of the forfeitable property described above.

A True Bill,

FOREPERSON

TROY RIVETTI
Acting United States Attorney
PA ID No. 56816

JEFFREY R. BENGEL
Assistant United States Attorney
DC ID No. 1018621

WILLIAM B. GUAPPONE
Assistant United States Attorney
NC ID No. 46075