IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | 2:23-CR-90 |
| v. | ) | |
| | ) | |
| DREW PIERCE; MARK MARRIOTT; | ) | |
| JOHN LAENG; and JOHN O'BRIEN, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OMNIBUS MEMORANDUM ORDER ON REMAINING PRETRIAL MOTIONS

**J. Nicholas Ranjan, United States District Judge**

Before the Court are various pretrial motions filed by Defendants. The Court has already granted Defendants' motion for the issuance of a subpoena (ECF 207); the Court issues this omnibus order resolving the remaining motions.

## FACTUAL AND PROCEDURAL BACKGROUND

At its core, the superseding indictment accuses Defendants of four separate schemes to defraud Primary Health Network (PHN) and a related entity, Lewistown-MSF, LLC. PHN is a federally qualified health center in Pennsylvania. Lewistown-MSF is a related entity[1] that served as the project manager in charge of developing a federally qualified health center in Lewistown, Pennsylvania. Several of the Defendants held relatively high positions with PHN or Lewistown-MSF, and used those positions to enter into phony contracts with other corporate entities that they owned or controlled, siphoning money from PHN and Lewistown-MSF through the other entities to enrich themselves.

---

[1] Palu Investment Group, Ltd. was a subsidiary of PHN, and held a 30% interest in Lewistown-MSF, LLC. ECF 122, ¶ 3. Defendant Drew Pierce was President of Palu. *Id.* at ¶ 4.

As noted, the superseding indictment alleged four separate schemes, which comprise the counts.[2]  The first three schemes are described in reference to the main corporate conduit that was used to bill PHN and Lewistown-MSF, and then kick back funds to certain Defendants: (1) the TopCoat scheme (counts 1-5); (2) the JDS scheme (counts 6-10); and (3) the Excel scheme (counts 11-14).  The fourth scheme is referred to in the indictment as "the personal benefits" scheme (counts 15-19), as the crux of the allegations there was that Defendants Pierce and Marriott defrauded PHN by using PHN funds to pay for their own personal expenses, and using PHN employees to perform work on their personal properties.

The Court here summarizes the conspiracy counts in the first two schemes (Counts 1 and 6), as those relate to the arguments Defendants make as part of their motions.

### TopCoat scheme (Count 1)

The government alleges that Defendants Pierce, Marriott, Laeng, and O'Brien conspired to commit wire fraud by submitting fraudulent invoices to PHN and Lewistown-MSF, seeking payments for services performed by TopCoat LLC, even though TopCoat had performed no actual work.  ECF 122, ¶¶ 17-18.  TopCoat was a management company owned 50% by Mr. Marriott and 50% by ThreeSDJ LLC.  *Id.* at ¶ 10.  ThreeSDJ, in turn, was owned 1/3rd by Mr. Pierce, 1/3rd by Mr. Laeng, and 1/3rd by an unnamed co-conspirator.  *Id.* at ¶ 11.  Defendants enriched themselves through the fraudulent invoices by causing PHN and Lewistown-MSF to pay amounts consistent with the fraudulent invoices.  *Id.* at ¶ 18.

Mr. Marriott, in his position as PHN's facilities administrator, created fraudulent invoices from TopCoat to PHN and caused PHN to pay TopCoat the amounts listed on the invoices.  *Id.* at ¶¶ 19-21.  Mr. Pierce, who was a high-level

---

[2] The specific counts include wire fraud, mail fraud, filing false tax returns, and conspiracy (to commit mail/wire fraud and to money launder).

executive at PHN, then used checks from TopCoat to pay the vendors that had actually performed the work on the project. *Id.* at ¶ 23. After paying the vendors, Mr. Pierce paid a portion of TopCoat's profits to Mr. Marriott and ThreeSDJ. *Id.* at ¶ 24.

As part of the conspiracy, Mr. Laeng and Mr. Pierce caused the creation of Lewistown-MSF, which was a project manager for the construction of a health center in Lewistown, Pennsylvania. *Id.* at ¶¶ 25-26. Defendants O'Brien, Marriott, and Pierce orchestrated a system through which Keystone Tele-Data (an entity allegedly controlled by Mr. O'Brien) provided Lewistown-MSF with increasingly inflated bids for systems services. *Id.* at ¶¶ 28-29, 31-33. Keystone Tele-Data entered into a contract for systems with TopCoat, through which TopCoat would bill Lewistown-MSF the full contracted amount and then TopCoat would pay Keystone Tele-Data a lower, contracted amount, even though TopCoat was performing no work. *Id.* at ¶ 31. Ultimately, Lewistown-MSF paid TopCoat approximately $719,396.02 for systems services; in turn, TopCoat paid Keystone Tele-Data $510,000. *Id.* at ¶¶ 35-36. The difference between the payments Lewistown-MSF paid to TopCoat and TopCoat paid to Keystone Tele-Data was distributed to Defendants Pierce, O'Brien, Laeng, and Marriott through a series of kickbacks. *Id.* at ¶¶ 37-39.

### *JDS scheme (Count 6)*

The government alleges that Defendants Pierce and Laeng conspired to commit wire fraud by causing PHN and Lewistown-MSF to pay inflated monetary amounts so that Defendants Pierce and Laeng could enrich themselves. *Id.* at ¶¶ 53-54. Defendants Laeng and Pierce used their positions with PHN and Lewistown-MSF to further this conspiracy. To enact the conspiracy, PHN entered into contracts for services with DC1.[3] *Id.* at ¶ 56. DC1 separately contracted with JDS Healthcare

---

[3] DC1 was partially owned by an unnamed co-conspirator (*i.e.*, "Co-Conspirator 2"). ECF 122, ¶ 12.

Strategies LLC, which was a purported management consulting company owned 1/3rd by Mr. Pierce, 1/3rd by Mr. Laeng, and 1/3rd by a person referred to as "Co-Conspirator 1." *Id.* at ¶ 13.

DC1 agreed to pay JDS 50% of what DC1 received from PHN for consulting services, even though JDS performed no work for DC1. *Id.* at ¶ 55. Defendants Laeng and Pierce caused PHN to enter into inflated contracts with DC1 for consulting services, fraudulently concealed from PHN that payments to DC1 were actually payments to JDS, and then used DC1 and JDS to pay themselves and another co-conspirator a portion of the money that PHN paid to DC1. *Id.* at ¶¶ 56-60.

Mr. Laeng also caused Lewistown-MSF to enter into a development agreement with DC1 and a project management agreement with FQHC-MSF (an entity for which Mr. Laeng served as president). *Id.* at ¶¶ 61-62. Through these agreements, DC1 received funds from PHN and Lewistown-MSF both directly and indirectly using FQHC-MSF and other accounts as intermediaries. *Id.* at ¶¶ 64-65. Mr. Laeng and Mr. Pierce then used DC1 to pay JDS funds, and used JDS to pay themselves a portion of the proceeds. *Id.* at ¶¶ 66-68.

## DISCUSSION AND ANALYSIS

**I.    Motions to dismiss Counts 1-10 (ECF 162, ECF 172)**

**A.    Counts 1 and 6 are each not duplicitous, as alleged**

Defendants Pierce, Laeng, and Marriott filed a motion to dismiss Counts 1-10 of the superseding indictment, joined by Mr. O'Brien. ECF 162; ECF 176. Defendants argue that Counts 1 and 6 are each duplicitous, because they each allege multiple conspiracies, rather than a single conspiracy. Defendants further argue that if Counts 1 and 6 fail, then the other derivative counts (Counts 2-5, and 7-10), must fail also. ECF 163, pp. 8, 17-18. After careful consideration, the Court will deny the motion, without prejudice.

"Duplicity is the improper combining of separate offenses into a single count." *United States v. Steiner*, 847 F.3d 103, 114 (3d Cir. 2017). "Duplicitous counts may conceal the specific charges, prevent the jury from deciding guilt or innocence with respect to a particular offense, exploit the risk of prejudicial evidentiary rulings, or endanger fair sentencing." *United States v. Haddy*, 134 F.3d 542, 548 (3d Cir. 1998) (cleaned up). A count that involves a "course of activity yet a single scheme" is not duplicitous. *Id.* at 549 (concluding that counts that tracked the statutory language and included multiple steps in the advancement of a scheme were not duplicitous). Additionally, "one conspiracy can involve multiple subsidiary schemes[,]" *United States v. Fattah*, 914 F.3d 112, 169 (3d Cir. 2019), and multiple victims. *United States v. Miller*, 41 F.4th 302, 313 (4th Cir. 2022). "Although its objectives may be numerous and diverse, a single conspiracy exists if there is one overall agreement among the parties to carry out those objectives." *United States v. Bobb*, 471 F.3d 491, 494-95 (3d Cir. 2006).

In determining whether a count is duplicitous, courts "ascertain the allowable unit of prosecution to decide whether the indictment properly charges a violation of the pertinent statute." *United States v. Root*, 585 F.3d 145, 150 (3d Cir. 2009). To do this, courts examine "the language of the statute." *Id.* For conspiracy, the unit of prosecution is "an agreement to commit an unlawful act." *United States v. Salahuddin*, 765 F.3d 329, 341 (3d Cir. 2014) (cleaned up).

For a conspiracy count, courts evaluate three factors to determine whether one conspiracy or multiple conspiracies exist: "(1) whether there was a common goal among the conspirators; (2) whether the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators; and (3) the extent to which the participants overlap in the various dealings." *United States v. Kemp*, 500 F.3d 257, 287 (3d Cir. 2007) (cleaned up).

The Court finds that the government has alleged a single conspiracy in each of Counts 1 and 6. Applying the three *Kemp* factors noted above, each of Counts 1 and 6 allege a single unit of prosecution.

Beginning with Count 1 (the TopCoat scheme):

First, the conspirators shared a common goal: inducing "PHN and Lewistown-MSF to pay TopCoat amounts consistent with the fraudulent invoices, thereby enriching themselves." ECF 122, ¶ 18.

Second, there was continuous cooperation between the conspirators to achieve a continuous result, as the indictment lays out, at least at a high level, how Defendants worked together to defraud PHN and Lewistown-MSF. *Id.* at ¶¶ 19-39.

Third, similarly, there was some overlap alleged between the conspirators with respect to the submission of the phony invoices. The most significant overlap was the connection with TopCoat, as that allegedly was the vehicle through which Defendants were paid, and at least three Defendants had ownership interests. *Id.* at ¶¶ 10-11 (TopCoat owned 50% by Defendant Marriott and 50% by ThreeSDJ, which in turn was owned 1/3 by Mr. Pierce, 1/3 by Mr. Laeng, and 1/3 by Co-Conspirator 1), 38 (Defendants Pierce and Laeng "caused ThreeSDJ to pay out the funds received from TopCoat to themselves and to Co-Conspirator 1.").

The same goes for Count 6 (the JDS Scheme), although that scheme operated slightly differently than the TopCoat scheme.

As discussed above, under the JDS scheme, Defendants Pierce and Laeng would cause payments to go from PHN or Lewistown-MSF to other affiliated or captive entities (like DC1 and FQHC-MSF), which would then send a share of the money to JDS—an entity that did nothing, and was equally owned by Mr. Pierce, Mr. Laeng, and so-called "Co-Conspirator 1." *Id.* at ¶¶ 13, 54. That JDS kickback would then be paid back to Mr. Pierce and Mr. Laeng. *Id.* at ¶ 68.

Applying the *Kemp* factors, the Court finds that the government has alleged a single conspiracy as to Count 6.

First, Defendants Pierce and Laeng (the two Defendants named in Count 6) shared a common goal: to enrich themselves by causing PHN and Lewistown-MSF to enter into inflated contracts. *Id.* at ¶¶ 52-56.

Second, the conspiracy was continuous because Defendants Pierce and Laeng entered into agreements, routed payments, and concealed the ultimate receiver of the payments such that they enriched themselves by defrauding PHN and Lewistown-MSF. *Id.* at ¶¶ 57-68.

Third, the participants overlapped because Defendants Pierce and Laeng were working in tandem throughout the conspiracy, as well as using the same entities that they or their co-conspirators owned or controlled (DC1, FQHC-MSF, and JDS) to perpetuate the scheme. *Id.* at ¶¶ 52-68.

The crux of Defendants' duplicity argument appears to be that the victims are different (PHN versus Lewistown-MSF), so the conspiracies must be different. ECF 163, p. 17. But having two victims doesn't turn one conspiracy into two. *Miller*, 41 F.4th at 313 (holding that a conspiracy with three different victims was one conspiracy because it involved "the same alleged modus operandi, the same fake entities, the same bank accounts, and the same ends"). The ultimate goal and the criminal means can be the same: an agreement to use affiliated companies to fraudulently funnel funds through false invoices, and skim the differences between the cost of the actual work performed and the higher phony invoices.[4]

---

[4] Indeed, if the government is right as to the evidence that it intends to present as to Count 1, the shift from TopCoat billing PHN to it instead billing Lewistown-MSF was a continuation of the same scheme; it was done to avoid detection when a PHN employee grew suspicious over a TopCoat invoice. ECF 195, p. 6. This type of evidence reinforces the continuity and commonality of the allegations forming the basis for Count 1's conspiracy: *i.e.*, the three owners of TopCoat using their

All that being said, conclusively resolving the duplicity argument at this point is premature. The question of whether the counts allege a single conspiracy or multiple ones is for the jury. *Bobb*, 471 F.3d at 494 ("The issue of whether a single conspiracy or multiple conspiracies exist is a fact question to be decided by a jury."). Defendants may end up being right once the trial evidence comes in—for example, if the evidence reflects that certain Defendants didn't operate in tandem with others, or weren't aware of the larger scheme, then Counts 1 or 6 could, in fact, be duplicitous. *See id.* ("Where a single conspiracy is alleged in the indictment, there is a variance if the evidence at trial proves only the existence of multiple conspiracies."). But this is ultimately a jury issue. Thus, while the Court denies Defendants' motion to dismiss, it does so without prejudice to Defendants requesting jury instructions and verdict interrogatories on this issue and otherwise re-raising their arguments during trial.

For these reasons, the Court finds that each of Count 1 and Count 6 are properly alleged and not duplicitous.

### B.    Defendants' other related arguments fail

Defendants raise other related arguments, but several of them are moot in light of the Court's finding above. The Court, though, addresses three of these challenges here.

First, Defendants argue that the government has not properly alleged a scheme to defraud in Counts 1 and 6 as to Lewistown-MSF, as Mr. Laeng was the president of Lewistown-MSF and cannot have "defraud[ed] himself." ECF 163, p. 16. This argument fails because it fights the facts in the indictment, and so is not proper to decide on a motion to dismiss. *United States v. Craig*, No. 21-338, 2024 WL 449386, at *1 n.1 (W.D. Pa. Feb. 6, 2024) (Conti, J.) ("A motion to dismiss the indictment challenges the adequacy of the indictment on its face and is not the appropriate

---

connections at PHN and Lewistown-MSF to obtain payments to which TopCoat wasn't entitled.

motion to challenge factual matters."); *United States v. Zielke*, No. 17-295, 2020 WL 758817, at *1 (W.D. Pa. Feb. 14, 2020) (Fischer, J.) ("[A] district court's review of the facts set forth in the indictment is limited to determining whether, assuming all of those facts as true, a jury could find that the defendant committed the offense for which he was charged." (cleaned up)). The government doesn't allege that Mr. Laeng was one and the same as Lewistown-MSF or had a 100% interest in that entity. It alleges that Mr. Laeng was an officer of that entity, and that he stole from it. *See* ECF 122, ¶¶ 19-39.

Second, Defendants argue that there was no scheme to defraud in Count 1 because Lewistown-MSF paid the full budgeted amount for systems to TopCoat. ECF 163, pp. 15-16. In other words, Lewistown-MSF suffered no losses.

This argument fails because loss to the victim is not an element of the offenses. "The federal wire fraud statute criminalizes 'any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.'" *United States v. Porat*, 76 F.4th 213, 218 (3d Cir. 2023) (quoting 18 U.S.C. § 1343). To allege a scheme to defraud, the government must allege that Defendants "engaged in deception [and] that money or property was an object of their fraud." *Ciminelli v. United States*, 598 U.S. 306, 312 (2023) (cleaned up). Count 1 alleges such deception: payment to TopCoat, which was an entity that didn't do any work on the project. That is at the core of the wire fraud statute, not loss to any victims. *Accord United States v. Woods*, No. 22-16, 2024 WL 1354586, at *12 (S.D. Ga. Mar. 29, 2024) (compiling cases, and quoting: "Particularly as to the charge here, financial loss is not at the core of ... wire frauds. Instead, the penal statutes also seek to punish the intent to obtain money or property from a victim by means of fraud and deceit. *United States v. Maxwell*, 579 F.3d 1282, 1302 (11th Cir. 2009) (rejecting defendant's sufficiency of the evidence argument where Defendant contended United States and county received contracted services and thus suffered

no loss); *see also United States v. Foster*, No. 13-20063, 2014 WL 12687616, at *7 (S.D. Fla. Mar. 31, 2014) (rejecting defendants' Rule 29 challenge to conspiracy to commit wire fraud conviction where defendants argued victims suffered no harm because conspirators paid back loans and noting that wire fraud statutes do not focus on the victim's actual loss but on the defendant's intent to obtain money or property by means of fraud or deceit) (quoting *United States v. Artuso*, 482 F. App'x 398, 402-03 (11th Cir. 2012))" (cleaned up)); *United States v. Tulio*, 263 F. App'x 258, 261 (3d Cir. 2008) (noting that "the relevant inquiry [under the mail fraud statute] concerns what [the defendant] intended—not whether [the victim] was *actually* deprived of money or property."); *United States v. Nagle*, No. 09-0384, 2019 WL 1403393, at *5 (M.D. Pa. Mar. 28, 2019) (stating that the wire fraud statutes "do not require the government to prove either contemplated harm to the victim or any loss, as it is not necessary to show that the victim was actually deprived of any money or property.").[5]

Third, Defendants argue that Count 6 does not allege a scheme to defraud because there are no allegations detailing why JDS's inclusion in the development of the Lewistown facility was improper, and further that Mr. Pierce had no duty to disclose the relationships between the entities. ECF 163, p. 20.

As stated above, a scheme to defraud requires a scheme to defraud by means of false pretenses, representations, or promises. *Porat*, 76 F.4th at 218. Here, Count 6 alleges that Defendants perpetuated a scheme to defraud Lewistown-MSF through the false representation that payments to DC1 were for work performed by DC1, when the payments were really payment to JDS that were being routed through DC1.

---

[5] But even if loss were an element of the offenses, whether Lewistown-MSF suffered any loss is a factual issue that goes to the nature of the evidence and will have to be decided by the jury. For example, was the fully budgeted amount for the services money that Lewistown-MSF was obligated to pay, or if the services ended up coming in under budget, could Lewistown-MSF have kept the difference or allocated the difference to other uses? An answer to that question could go to whether Lewistown-MSF suffered loss here.

ECF 122, ¶ 66.  These allegations show that JDS's involvement was improper because it performed no work and was simply a vessel for Defendants to enrich themselves. *Id.* at ¶ 60.

As to Defendants' argument that Mr. Pierce had no duty to disclose, Defendants argue that Paragraphs 58 and 66 of the indictment specifically allege that Mr. Pierce and Mr. Laeng "fraudulently concealed" that the payments to DC1 were routed to JDS.  Defendants, relying heavily on *United States v. Steffen*, 687 F.3d 1104 (8th Cir. 2012), argue that the indictment does not allege any duty by Defendants to disclose the movement of those payments or their relationship with JDS, so there can be no fraud here.

Defendants may have a point if the theory in the indictment was one based solely on non-disclosure, like the indictment in *Steffen*.  But the indictment here alleges affirmative misrepresentations, which would not require any duty to disclose. *See, e.g.*, *United States v. Sarfo*, No. 23-132, 2024 WL 3706679, at *6 (D. Nev. May 24, 2024) (denying motion to dismiss and holding that *Steffen* was not applicable in a fraud cause where defendants were "alleged to have made multiple affirmative material misrepresentations" despite no duty to disclose), *report and recommendation adopted*, No. 23-132, 2024 WL 3706734 (D. Nev. Aug. 6, 2024).  For example, the indictment alleges that Mr. Pierce, along with his co-conspirators, made the false representation that Lewistown-MSF's payments to DC1 were for consulting services, when really the payments were being funneled to Defendants and their co-conspirators through JDS.  ECF 122, ¶¶ 56, 63.  These are critical allegations and tie the conduct at issue here to more than mere non-disclosure.

For these reasons, these additional arguments for dismissal fail.

### C.    Mr. O'Brien's motion to dismiss (ECF 172)

Mr. O'Brien filed a separate motion to dismiss (ECF 172), joined by Defendants Pierce, Laeng, and Marriott as to section III.C only.  ECF 182; ECF 183; ECF 187.

Mr. O'Brien's role in this case is limited to the TopCoat scheme and specifically to Counts 1-4. As noted above, the indictment alleges that Mr. O'Brien controlled Keystone Tele-Data. As part of the TopCoat scheme, the indictment alleges essentially that TopCoat and Keystone would enter into contracts for different projects at the Lewistown-MSF. ECF 122, ¶¶ 19-39. TopCoat would obtain an inflated rate for the services that Keystone performed, and the difference would be kicked back to Mr. Marriott, Mr. Pierce, and Mr. Laeng. *Id.* at ¶¶ 34, 37-38. Additionally, for one project, Keystone provided an inflated price of $510,000 directly to Lewistown-MSF, and Mr. O'Brien, through Keystone, paid Mr. Marriott a portion of that directly. *Id.* at ¶¶ 36-37.

Mr. O'Brien moves to dismiss these counts for three reasons, none of which succeed.

First, Mr. O'Brien argues that Count 1 is duplicitous, but in a different way. Mr. O'Brien argues that Count 1 states two separate conspiracies against him: (1) a conspiracy to defraud Lewistown-MSF through inflated bids; and (2) a conspiracy to provide Mr. Marriott with a series of kickbacks from Keystone. He argues that these were separate unrelated agreements—an agreement to defraud Lewistown-MSF and a separate agreement to pay kickbacks to Mr. Marriott. ECF 173, p. 7. The Court disagrees.

Applying the three *Kemp* factors noted above, there was a single common goal—to defraud Lewistown-MSF; there was a clear continuation of conduct here that was necessary—*e.g.*, the funds obtained through the inflated bids from Lewistown-MSF were paid, in part, by the kickbacks from Mr. O'Brien to Mr. Marriott; and the overlap here between the participants is clear.

Again, if the trial evidence alters the picture painted by the indictment, Mr. O'Brien is free to raise his duplicity argument at trial, including by requesting jury

instructions and special interrogatories. But, as pled, the indictment alleges a single unit of prosecution.

Second, Mr. O'Brien expressly attacks the facts in the indictment. He alleges that there is insufficient evidence to link him to control over Keystone, and that he did not participate in the wires, so the wire fraud claims fail. ECF 173, p. 11. The problem with this argument is that it asks the Court to weigh the evidence, which it cannot do at this stage. Mr. O'Brien invokes exceptions to the rule that the court cannot go outside of the four corners of the indictment, but those exceptions do not apply here. *United States v. DeLaurentis*, 230 F.3d 659, 660 (3d Cir. 2000) (exceptions include where "there is a stipulated record" or "immunity issues are implicated").

Third, Mr. O'Brien argues that Counts 2-4 (the substantive wire fraud counts) must be dismissed because he did not transmit those wires or cause them to be transmitted. ECF 173, p. 16. That doesn't matter; "the statute does not require that the defendant himself sent the communication or that he intended that interstate wire communications would be used." *United States v. Andrews*, 681 F.3d 509, 529 (3d Cir. 2012). It is sufficient that "the use of interstate wire communications was reasonably foreseeable." *Id.*

Here, given the allegations as a whole in the indictment, including Mr. O'Brien's control of Keystone, the manner of the scheme, and the three emails identified, there is a sufficient basis that the use of wire communications was reasonably foreseeable. Any dispute over this is more of a factual one, and therefore must be raised at trial. *Craig*, No. 21-338, 2024 WL 449386, at *1 n.1. As such, the Court will deny Mr. O'Brien's motion.

## II.    Mr. O'Brien's motion for severance (ECF 168)

Mr. O'Brien requests severance of the counts regarding the TopCoat scheme because the distinct schemes are not properly joined under Rule 8(b); in the

alternative, he seeks severance from his co-defendants under Rule 14 because he would be prejudiced by being tried with them.  ECF 168, ¶¶ 1-2.

### A.    Joinder is proper under Rule 8(b)

Mr. O'Brien argues that Counts 1-5 (the TopCoat scheme) should be severed and tried separately from the rest of the case because the TopCoat scheme is distinct from the other schemes in the indictment.  ECF 169, p. 6.  He argues that the four different schemes lack a transactional nexus, allege distinct manners and means, involved different co-conspirators and entities, and are not part of the same act or transaction and thus are not sufficiently connected to be joined.  *Id.* at p. 11.  The government argues that Counts 1-5 are properly joined because all four schemes alleged in the superseding indictment involve the same victims, same motive, and overlapping defendants.  ECF 195, pp. 43-44.

An indictment "may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  Fed. R. Crim. P. 8(b).  In multi-defendant cases, "the tests for joinder of counts and defendants is merged in Rule 8(b)."  *United States v. Irizarry*, 341 F.3d 273, 287 (3d Cir. 2003) (cleaned up).  For joinder to be proper, "there must exist a transactional nexus in that the defendants must have participated in the same act or transaction, or in the same series of acts or transactions[.]"  *United States v. Jimenez*, 513 F.3d 62, 83 (3d Cir. 2008) (cleaned up).  Multiple schemes that are part of a larger fraudulent scheme can be properly joined under Rule 8(b).  *United States v. Staph*, No. 09-42, 2010 WL 2884694, at *6-*7 (W.D. Pa. July 21, 2010) (Diamond, J.) (finding that a defendant was properly joined with another defendant because the conduct underlying the counts was related to the same series of acts and transactions).

Here, the touchstone of the analysis is really whether the multiple schemes alleged are substantively interrelated, and the Court finds that they are.  The victims

are the same or related; the methods and modes of operation are the same (*i.e.*, the use of inflated or phony bids, through captive of controlled companies); the participants overlap at least to some degree across the schemes (for example, the indictment alleges Mr. O'Brien's interactions with Mr. Marriott, who had a role in the other schemes). The superseding indictment alleges multiple schemes that are all a part of the same overlapping fraudulent endeavor. *See Staph*, 2010 WL 2884694, at *7. Thus, Counts 1-5 are properly joined under Rule 8(b).

**B.    The Court will not sever trials under Rule 14**

Mr. O'Brien argues that even if Counts 1-5 are properly joined, he will suffer prejudice if he is tried jointly with his co-defendants. ECF 168, ¶¶ 1-2.

Even if joinder is proper, a court may sever defendants' trials if the joinder would prejudice a single defendant. Fed. R. Crim. P. 14(a). "Defendants seeking a severance bear a heavy burden[.]" *United States v. Lore*, 430 F.3d 190, 205 (3d Cir. 2005) (cleaned up). For severance to be granted, a "defendant must pinpoint clear and substantial prejudice resulting in an unfair trial." *United States v. Riley*, 621 F.3d 312, 335 (3d Cir. 2010), *as amended* (Oct. 21, 2010) (cleaned up). "A district court's ruling on a motion for severance is discretionary." *United States v. Mitchell*, No. 9-105, 2013 WL 12202650, at *9 (W.D. Pa. May 6, 2013) (Cercone, J.). The court must balance "the potential prejudice to the defendant against the advantages of joinder in terms of judicial economy." *Id.* "[A] defendant is not entitled to a severance merely because evidence against a co-defendant is more damaging than the evidence against the moving party." *United States v. Walker*, 657 F.3d 160, 170 (3d Cir. 2011) (cleaned up). In criminal trials, juries are presumed to be able to compartmentalize evidence, and any remaining prejudice can be cured by an appropriate jury instruction. *Mitchell*, 2013 WL 12202650 at *10.

Mr. O'Brien argues that he will be prejudiced by a joint trial because the schemes alleged in the indictment are complex, there will likely be voluminous

evidence, and the charges and evidence against him are only a fraction of the total charges and evidence. ECF 169, pp. 12-14. The Court disagrees, for at least three reasons.

First, even assuming the schemes here to be complex and the evidence to be voluminous, that isn't enough reason to sever Counts 1-5. *See Walker*, 657 F.3d at 170. Mr. O'Brien has not identified a reason that a jury will not be able to sufficiently compartmentalize the evidence other than the fact that the case is complex.

Second, Mr. O'Brien's relative culpability also doesn't move the needle. Mr. O'Brien may have been uninvolved in the other schemes, but the Court can provide rather straightforward limiting instructions to ensure that actions, evidence or statements by others related to those schemes cannot be considered in assessing Mr. O'Brien's guilt. This can also be reinforced and clarified in the verdict form, including how questions are phrased and how the form is formatted.

Third, it is well-settled that judicial economy is served by having a single trial. *See Mitchell*, 2013 WL 12202650, at *9 (stating that "[i]t is well established, however, that judicial economy favors a joint trial where defendants are jointly indicted."). The government identifies substantial overlap in the documentary evidence and testifying witnesses between the different schemes. ECF 195, p. 46. The government also points out that severance of the TopCoat scheme would "lead to an absurd result" because Mr. O'Brien is not charged in Count 5, and neither the government nor the defendants charged in that Count seek severance of Count 5. *Id.*

For these reasons, Mr. O'Brien has not demonstrated that Counts 1-5 were improperly joined nor has he met his burden for severance, and so the motion will be denied.

-16-

### III.    Defendants Pierce, Marriott, and Laeng's motion to produce Rule 404(b) and Rule 609 evidence (ECF 159)

Mr. Pierce, joined by Mr. Laeng and Mr. Marriott, ask for notice of evidence under Rules 404(b) and 609 (ECF 159; ECF 178; ECF 179) and request disclosure of this material 30 days after the entry of the order resolving the motion. ECF 160, p. 9. The government objects to this timing, but doesn't oppose an order that would require Rule 404(b) notice be provided 30 days before trial, or at a date certain before trial. ECF 195, p. 38.

What notice is reasonable under Rule 404(b) depends on "the circumstances and complexity" of the case. *United States v. Coles*, 511 F. Supp. 3d 566, 593 (M.D. Pa. 2021) (cleaned up). "In general, courts have found that, 'reasonable notice' under Rule 404(b) is in the range of seven to ten days or one to two weeks prior to trial." *United States v. Baldwin*, No. 22-284, 2024 WL 1003968, at *2 (W.D. Pa. Mar. 8, 2024) (Horan, J.). When a case is complex, courts have ordered more notice—for example, at least 30 days before trial. *Coles*, 511 F. Supp. 3d at 593.

The Court finds that this case is particularly complex, given the nature of the allegations here, the number of defendants, the different corporate entities and schemes, and the volume of discovery (including third-party discovery). The Court finds that it would benefit the parties (and the Court) to have a longer notice period, so that the Court can resolve any disputes well in advance of trial.

For these reasons, the Court will grant, in part, Defendants' motion, and order that the government serve its Rule 404(b) and Rule 609 notice 60 days before trial.[6]

---

[6] The government also argues that Defendants appear to be seeking intrinsic evidence as part of their motion. Obviously intrinsic evidence is not subject to Rule 404(b). *United States v. Green*, 617 F.3d 233, 249 (3d Cir. 2010). Any intrinsic evidence to be used at trial will be disclosed as part of the exchange of trial exhibits. As part of the pretrial order, the Court anticipates a longer horizon for that disclosure, so any disputes can be briefed and resolved in advance of trial.

### IV.    Mr. O'Brien's motion for discovery (ECF 177)

Mr. O'Brien (ECF 177), joined by Mr. Pierce (ECF 185) and Mr. Laeng (ECF 191), moves for an order requiring "the government to: (1) provide Jencks Act (18 U.S.C. § 3500) material no later than thirty days before trial; (2) provide discovery pursuant to *Brady v. Maryland*, *Giglio v. United States* and their progeny; (3) provide F.R.E. 404(b) evidence no later than thirty days before trial; and (4) preserve all rough notes, including those of all interviews, taken by law enforcement officers in connection with this investigation." ECF 171, p. 5. The Court will grant in part and deny in part the motions, as follows.

### A.    Early disclosure of Jencks Act material is encouraged

Mr. O'Brien requests disclosure of Jencks Act material at least 30 days before trial. ECF 171, pp. 8-10. "The Jencks Act requires a court, upon motion of the defendant and after direct examination of a government witness, to order the United States to produce to the defense any statement of the witness in its possession which relates to the subject matter as to which the witness has testified." *United States v. Ramos*, 27 F.3d 65, 69 (3d Cir. 1994) (cleaned up). "[C]ourts lack the authority to order the early disclosure of Jencks material[.]" *United States v. Moore*, No. 23-40, 2024 WL 2785075, at *3 n.2 (W.D. Pa. May 30, 2024) (Cercone, J.). In light of this lack of authority, courts "can encourage the government to provide the defense with Jencks Act materials in time to avoid unnecessary delays during trial," or the government can agree to early disclosure. *United States v. Ramirez-Cervantes*, No. 22-226, 2023 WL 8595928, at *3 (W.D. Pa. Dec. 12, 2023) (Horan, J.).

Because the Court is not authorized to order early disclosure in the absence of an agreement between the parties, the motion is denied as to early disclosure of Jencks Act materials. The Court encourages the parties to agree on a disclosure schedule, preferably with disclosure occurring no longer than two weeks before trial.

**B.    Timely disclosure of *Brady/Giglio* material is required**

Mr. O'Brien requests early disclosure of these materials to aid in trial preparation. ECF 171, pp. 10-12. The government acknowledges its continuing obligation to disclose exculpatory material under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, and states that it is unaware of any undisclosed *Brady* material. ECF 195, p. 35. The government also represents that it is aware of its obligations under *Giglio* and states that it will comply with those obligations. *Id.* The government argues that some of the information Defendants request, such as names and addresses of witnesses, are not *Brady* material. *Id.*

"It is well-settled that the Government is not obliged to provide a witness list in a non-capital case prior to trial, except as otherwise required by the Jencks Act relative to witness statements." *United States v. Calloway*, No. 20-80, 2022 WL 897911, at *2 (W.D. Pa. Mar. 28, 2022) (Haines, J.). Impeachment material must be disclosed "in time for its effective use at trial." *United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983). Consistent with prior practice, the Court orders that *Brady* material be disclosed upon discovery and impeachment material (including *Giglio* material) be disclosed two weeks before trial. *See United States v. DiPippa*, No. 23-146, 2024 WL 1431385, at *1 (W.D. Pa. Apr. 3, 2024) (Ranjan, J.). Non-*Brady* material, such as the names and addresses of witnesses and any material outside the scope of *Brady*, need not be disclosed in the timeframe that is otherwise required for the disclosure of *Brady* material.

**C.    Disclosure of Rule 404(b) evidence will be required 60 days before trial**

Mr. O'Brien requests disclosure of this material 30 days before trial. ECF 171, pp. 12-13. The Court will grant this motion, but will order disclosure to be 60 days before trial, consistent with the timing for the other Defendants.

### D.    Preservation of investigative notes will be ordered

Defendants request an order directing the government to preserve rough notes and draft reports written by law enforcement.  ECF 171, p. 13-14.  The government states that it understands that its agents are required to keep such investigative notes and does not oppose the entry of an order.  ECF 195, pp. 36-37.  Accordingly, the motion will be granted as to this request, and the Court will order the government to preserve rough notes and draft reports written by law enforcement under its control.

## V.    Motions for a bill of particulars (ECF 164; ECF 174)

Defendants Pierce, Marriott, and Laeng filed a motion for a bill of particulars. ECF 164.  Mr. O'Brien filed a separate motion for a bill of particulars (ECF 174) that Defendants Pierce and Laeng joined.  ECF 186; ECF 192.

Defendants Pierce, Marriott, and Laeng request a bill of particulars providing details about Counts 1, 6, and 11 on the grounds that Counts 1 and 6 improperly join two distinct and separate offenses and do not contain sufficient factual details and Count 11 "fails to identify what contracting services or fraudulent invoices" were part of the scheme.  ECF 166, p. 9.  Mr. O'Brien requests a bill of particulars on the grounds that: (1) the indictment states that Mr. O'Brien "controlled" Keystone Tele-Data without supporting facts; (2) the government has not shown any facts to show that a bid provided by Keystone Tele-Data was inflated; (3) there are no facts to show that Mr. O'Brien participated in wire fraud as alleged in Counts 2-4.   ECF 175.

A bill of particulars "is not intended to provide a defendant with the fruits of the Government's investigation, but rather to give the defendant only that minimum amount of information necessary to allow him to conduct his own investigation." *United States v. Hvizdzak*, No. 21-30, 2022 WL 295879, at *2 (W.D. Pa. Feb. 1, 2022) (Hardy, J.).  When ruling on a motion for a bill of particulars, courts should "consider all information that has been disclosed to Defendants in the course of the prosecution,

whether or not included in the indictment." *United States v. Reed*, No. 18-101, 2019 WL 80252, at *3 (W.D. Pa. Jan. 2, 2019) (Schwab, J.). This is because a motion for a bill of particulars does not entitle a defendant to "wholesale discovery of the government's evidence[.]" *United States v. Armocida*, 515 F.2d 49, 54 (3d Cir. 1975) (cleaned up) (holding that a district court did not abuse its discretion in denying a motion for a bill of particulars where the defendant requested "the when, where and how of any overt acts not alleged in the indictment[.]" (cleaned up)). A district court has broad discretion in granting or denying a criminal defendant's motion for a bill of particulars. *United States v. Rosa*, 891 F.2d 1063, 1066 (3d Cir. 1989).

The Court will deny both motions. The government represents that it has provided ample information to Defendants Pierce, Marriott, Laeng, and O'Brien, including two reverse proffers with Mr. Marriott, a production of approximately 140,000 documents, and information about specific documents included in that production. Some of the specific information the government has provided includes metadata, the government's foldering structure, identification of specific Bates numbers and page numbers in response to a request from Mr. Pierce, and identification of information specific to Mr. O'Brien. ECF 195, pp. 22-23, 32. Given the government's disclosures to Defendants, a bill of particulars is not necessary.

Finally, given that the Court intends to provide longer disclosure periods in advance of trial for Rule 404(b) and Rule 609 information, as well as a longer period for the exchange of trial exhibits, this will largely alleviate Defendants' concerns and provide Defendants with ample advance notice of the trial evidence in this case. This too means that a separate bill of particulars is unwarranted here.

**********************

For the reasons stated above, the Court **HEREBY ORDERS**:

1.      Defendants Pierce, Laeng, and Marriott's motion to dismiss Counts 1-10 of the indictment (ECF 162) is **DENIED**;

2.      Mr. O'Brien's motion to dismiss (ECF 172) is **DENIED**;

3.      Mr. O'Brien's motion for severance (ECF 168) is **DENIED**;

4.      Defendants Pierce, Marriott, and Laeng's motion to produce Rule 404(b) and Rule 609 evidence (ECF 159) is **GRANTED IN PART** and **DENIED IN PART**, and the government shall provide Rule 404(b) and Rule 609 notices 60 days before trial;

5.      Mr. O'Brien's motion for discovery (ECF 177) is **GRANTED IN PART** and **DENIED IN PART**, and the government shall disclose *Brady* material immediately upon its discovery to all Defendants, shall disclose *Giglio* material two weeks before trial, shall order all law enforcement agents under its control to preserve investigative notes, and is encouraged to disclose Jencks Act material two weeks before trial;

6.      Defendants Pierce, Marriott, and Laeng's motion for a bill of particulars (ECF 164) is **DENIED**;

7.      Mr. O'Brien's motion for a bill of particulars (ECF 174) is **DENIED**.

DATE:  March 27, 2025                     BY THE COURT:

                                          /s/ *J. Nicholas Ranjan*
                                          United States District Judge